# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

T & J MEAT PACKING, INC.,

     Plaintiff,

        v.

SERVICE EMPLOYEES
INTERNATIONAL UNION, LOCAL 1,
AFL-CIO,

     Defendant.

No. 04 C 1475
Judge James B. Zagel

## AMENDED MEMORANDUM OPINION AND ORDER

Plaintiff T & J Meat Packing, Inc. (the "Company") brought this action on February 25, 2004, under § 301 of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185,[1] seeking relief under the Declaratory Judgment Act, as amended, 28 U.S.C. §§ 2201 and 2202. The Company seeks a declaration that no collective bargaining agreement ("CBA") was entered into on September 23, 2003 between it and Defendant Service Employees International Union, Local 1, AFL-CIO (the "Union" or "Local 1"), the collective bargaining representative of the Company's production and maintenance employees.[2]

---

[1] Section 301 states "[s]uits for violation of contracts between an employer and a labor organization . . . may be brought in any district court of the United States."

[2] Prior to the filing of this Complaint, the Union filed unfair labor practice charges with the National Labor Relations Board ("NLRB") claiming that the Company violated § 8(a)(5) and (a)(3) of the LMRA, 29 U.S.C. §158(a)(5) and (a)(3). A hearing on this matter was set for April 15, 2004, but I was recently informed that the NLRB was withdrawing the unfair labor practice complaint and notice of hearing, and dismissing the unfair labor practice charges in the pending NLRB case.

On March 4, 2004, the Company moved to advance this case for a speedy hearing pursuant to Federal Rule of Civil Procedure 57.  On March 9, however, the Union claimed that *Textron Lycoming Reciprocating Engine Div. v. UAW*, 523 U.S. 653 (1998), precludes me from exercising jurisdiction over this case.  On March 10, I granted the Company's motion for a speedy hearing, finding that § 301 jurisdiction exists.  On March 24, the NLRB moved to intervene in the case and to stay these proceedings on the grounds of: (1) the alleged questionability of jurisdiction in light of *Textron* and subsequently conflicting case authority, and (2) various prudential considerations.  At the March 26 status hearing, I granted the NLRB status as an intervener, took the motion to stay under advisement until after the hearing, suggested that the Company might want to move for leave to amend its Complaint in light of the jurisdictional issues raised in the NLRB's motion, and commenced the hearing in this matter.  Prior to the conclusion of this hearing on March 29, the Company moved for leave to file instanter its First Amended Complaint.  On April 1, the NLRB withdrew its motion to stay.

In this decision, I resolve the Company's motion to file its amended complaint, and to the extent that the Union moved to dismiss this case for lack of jurisdiction on March 9, I hereby elaborate on my reasons for denying this motion.  Thereafter, I issue my findings of fact and conclusions of law resulting from the hearing on March 26 and 29.

The Company's Motion for Leave to File Instanter Its First Amended Complaint

In the face of a motion to dismiss, the party against whom the motion is made is given an opportunity to respond in writing.  My customary practice is to also give the party the opportunity to amend its complaint to correct any facial deficiencies.  Fed.R.Civ.P. 15(a) (providing that

leave to amend a pleading "shall be freely given when justice so requires."). In this case, however, I did not give the Company an opportunity to amend its Complaint when the Union first raised the concern that jurisdiction did not exist as the case had been pleaded. Rather, I summarily concluded that § 301 jurisdiction existed. The NLRB's pending motion to stay essentially asks that I reconsider this ruling. Were I to find that there is no subject matter jurisdiction, I would be forced to dismiss the Company's case. Therefore, I think it is only fair to give the Company the same opportunity customarily given to every other litigant in this court facing the possibility of dismissal. Accordingly, I grant the Company's motion for leave to file its Amended Complaint.

The Union's Motion to Dismiss

In *Textron*, the plaintiff union sued under § 301 claiming that the employer had fraudulently induced it to sign a CBA, and the Union sought a declaratory judgment that the agreement was voidable at its option. *Id*. at 654-55. The Union made no claim that either it or the employer had violated the terms of the agreement. *Id*. In finding that no subject matter jurisdiction existed, the Supreme Court determined that § 301 conferred jurisdiction only over "[s]uits for violations of contracts." *Id*. at 656-57. It concluded that since no one was alleging any breach of contract – and in fact that both parties appeared to be in compliance with the terms of the contract – there was no basis for subject matter jurisdiction. In the Court's view, the union was simply asking that an admitted contract be declared invalid. *Id*. at 658. However, the Court further observed:

This does not mean that a federal court can never adjudicate the validity of a contract under § 301(a). That provision simply erects a gateway through which parties may pass into federal court; once they have entered, it does not restrict the legal landscape they may traverse. Thus if, in the course of deciding whether a plaintiff is entitled to relief for the defendant's alleged violation of a contract, the defendant interposes the affirmative defense that the contract was invalid, the court may, consistent with § 301(a), adjudicate that defense. . . . *Similarly, a declaratory judgment plaintiff accused of violating a collective-bargaining agreement may ask a court to declare the agreement invalid.* But in these cases, the federal court's power to adjudicate the contract's validity is ancillary to, and not independent of, its power to adjudicate "[s]uits for violation of contracts."

*Id*. at 657-8 (quotation omitted and emphasis added).

Under *Textron*, a party must allege a breach of contract for there to be subject matter jurisdiction. Indeed, this is the interpretation that the only case in this district addressing the issue has taken. In *Chicago & N.E. Ill. Dist. Council Carpenters v. GDCNI/CAWCC*, No. 01 C 6097, 2002 WL 237972 (N.D. Ill. Feb. 19, 2002), the plaintiff union alleged that the employer agreed to the terms of a successor CBA while the employer denied that an agreement had been reached. Both the union and the employer had also filed unfair labor practice charges with the NLRB, and although the NLRB's Regional Office dismissed those charges, both parties appealed to the NLRB's General Counsel. *Id*. at *1. The district court dismissed the § 301 suit on the basis that the union had failed to assert a breach of contract:

Here, Plaintiff's complaint fails to allege a violation of a contract, *i.e.* the agreement, and instead merely asserts a claim for a declaratory judgment as to the formation and validity of the contract. . . . Under *Textron*, such a claim standing alone fails to establish federal subject matter jurisdiction and prevents this court from reviewing the complaint. . . . [I]n its response to the motion to dismiss, Plaintiff asserts in a single sentence "[i]n this lawsuit the Plaintiff is requesting that the Court adjudicate whether there is a valid contract between the parties and to find that the Defendant is violating the valid contract in not recognizing it and not adhering to the provisions found in it." . . . [E]ven if this court considered the amendatory statement Plaintiff included in its response, at best Plaintiff has still not alleged how Defendant violated the agreement and at worst Plaintiff has engaged in circular reasoning. Plaintiff attempts to add a claim of contract violation to the actual single issue of contract validity by redefining its complaint to request the

4

court "find that the Defendant is violating that valid contract in not recognizing it." Plaintiff's circular definition of contract violation actually states the claim for contract formation and validity. Further, Plaintiff simply states Defendant "is violating that valid contract in . . . not adhering to the provisions found in it," and yet fails to cite any sections of the contract which were violated or to even suggest what action or inaction by Defendant was violating the agreement. Once again, only legitimate allegations of contract violation confer upon this court the subject matter jurisdiction to assess contract validity.

*Id*. at *4-5.

At least one court outside this district also supports this interpretation of *Textron*. In *American Standard, Inc. v. Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union Local 7A*, No. 3:03CV7023, 2003 WL 21478861 (N.D. Ohio Jun. 17, 2003), an employer brought a § 301 suit against a union claiming that the parties had reached agreement on the terms of a contract and that the union's repudiation of that agreement amounted to a breach. The union argued that a contract had not been formed. The same dispute was also the subject of an unfair labor practice case brought by the union before the NLRB. The district court dismissed the suit in reliance on *Textron*, and noted in particular that determination of the dispute would hinge on whether the parties' negotiations resulted in a binding contract, since the "employer is not claiming a specific breach of one or more terms of the . . . contract which both parties are implementing." *Id*. at *2. The court remarked that according to *Textron*, the NLRB has primary jurisdiction to resolve disputes such as this that involve review of the collective bargaining process. *Id*.

On the other hand, some courts outside this district have interpreted *Textron*'s construction of § 301 to extend jurisdiction when a breach of contract is implied, rather than alleged expressly. In *Darigold, Inc. v. Teamsters, Local 524*, No. CY-03-3099-EFS, 2003 WL

22295327 (E.D. Wash. Sept. 5, 2003), the employer sought a declaration that the parties' contract had not expired and that the contract therefore prohibited the union from engaging in its threatened strike activity against the employer. Citing *Textron*, the court concluded that since the threatened strike activity might result in a breach of the contract's no-strike clause, jurisdiction existed under § 301. *Id*. at *2. Similarly, in *Bulkmatic Transp. Co. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers & Union Local 407*, 213 F.Supp. 2d 946 (N.D. Ind. 2002), the employer sought a declaration under § 301 that the parties' area agreement covering employees in one of the employer's plants did not apply to employees at another plant. The union filed a counterclaim seeking an order confirming an arbitration award the union already had obtained against the employer. Relying on *Textron*, the district court concluded that jurisdiction existed because a finding that the employer refused to extend the contract terms to employees at the second plant would mean that the employer had violated the contract. *Id*. at 951.

In the end, the standard set forth in *Chicago Dist. Council Carpenters* is what best governs here. According to that case, *Textron* requires that a party allege in its complaint that its adversary has violated a contract or that the party itself has been accused by its adversary of violating a contract. If management is the plaintiff seeking relief from a district court under § 301, a union need not counterclaim that management has breached a contract for there to be jurisdiction; it is sufficient for management to allege in its complaint that it has been accused by the union of breaching a contract. Finally, any party making such aforementioned allegations must allege with particularity the sections of a contract alleged to have been violated or the actions or inactions alleged to be taken in violation of a contract.

6

Here, the Company's First Amended Complaint meets the standard set forth in *Chicago Dist. Council Carpenters*. The Complaint alleges:

> The Union further maintains that the Company is presently in breach of that claimed agreement by having failed and refused to pay a bonus of $100.00 in the second week of December 2003 and by having fail[ed] and refus[ed] to implement an across the board salary increase effective January 1, 2004, as called for by that contract. The Union also maintains that the Company will be in further breach of the contract should it fail or refuse to implement the January 1, 2005 wage increase of $.10, or should it fail or refuse to pay $100.00 bonuses in the second week of December 2004 and December 2005 as called for by the claimed agreement.[3]

Along with these allegations in the Complaint, it is clear from testimony offered by Union officials that the failure of the Company to implement the bonus and wage increases allegedly agreed upon was the primary reason for the strike called in October 2003. For example, Charles Bridgemon, a Union official, was asked the following question and gave the following response:

> Q: Why did the union strike?
> A: Because the Company agreed to a contract and then refused to implement it.

This brief exchange illustrates that the heart of the underlying dispute here is that by refusing to recognize any agreement, the Company has not implemented the wage increases and bonuses that the putative agreement calls for and does not intend to do so, and that the Union regards such inaction as violations of the claimed agreement. In other words, the heart of the dispute here is the Company's failure to pay the allegedly agreed upon bonuses and raises – in other words, its

---

[3] The NLRB suggests that the Company may have manipulated these facts in light of *Textron* to improperly frame the underlying dispute as a breach of contract dispute. While this is possibly true, it is equally possible that the Union may have manipulated the facts as alleged to the NLRB to *avoid* framing the underlying dispute as a breach of contract dispute. In other words, although the Company may have artfully phrased its allegations to specifically mention a "breach of contract," the Union may have similarly artfully phrased its allegations to the NLRB to avoid mentioning any "breach of a contract."

breach. Therefore, subject matter jurisdiction exists, and my decision on March 9 dismissing the Company's motion to dismiss for lack of jurisdiction is correct.

For the reasons above, the Company's Motion for Leave to File Instanter Its First Amended Complaint is GRANTED and the Union's Oral Motion to Dismiss is DENIED.


## FINDINGS OF FACT

Undisputed Facts

Leaving aside all conflicts, the parties do not dispute the following facts:

1.      The Company is engaged in the business of meat packaging and the wholesale and retail distribution of meat products in interstate commerce.  It is a corporation organized and existing under the laws of the State of Illinois and has its principal office and place of business in Chicago Heights, Illinois, within the territorial jurisdiction of this Court.  The Company thereby is an employer in an industry affecting commerce within the provisions of § 301 of the LMRA, 29 U.S.C. §185, and the definitions contained in §§ 2(2) and 501(1) and (3) of the LMRA, 29 U.S.C. § 152(2), 142(1) and (3).

2.      Defendant Union is the bargaining representative of the Company's production and maintenance employees and, as such, is a labor organization representing employees affecting commerce within the meaning of § 301 of the LMRA, and the definitions contained in §§ 2(5), and 501(1) and (3) of the LMRA, 29 U.S.C. §§ 152(5), 142(1) and (3).

3.      The Company is a family owned and operated business.  Its shareholders consist of 9 members of the Lilovich family, each of whom own 10% of the shares, except for the President, Tony Alilovich, who owns 20%.

4.      The Company has been in business for the past 20 years.  During most of that time the Company's production and maintenance employees have been represented for collective bargaining purposes by a succession of labor organizations and have been covered by successive collective bargaining agreements negotiated on their behalf.

5.      For much of that time period and until 2000, the employees' collective bargaining representative was Local 73 of the Service Employees International Union.  Also during that time the Company experienced no strikes or major labor disputes.  The last collective bargaining agreement negotiated with Local 73 was a three-year agreement.  Neither party was able to present an executed version of that agreement, but an unsigned draft of that agreement, dated December 2, 1997, containing blanks for wages as well as starting and ending dates, was admitted into evidence.  At some point in the year 2000, Local 1 took over from Local 73 as the representative of the employees.

6.      In 2002, Local 1 assigned a new business agent, Oscar Sandoval, to the Company, and negotiations began for a successor agreement.  By early 2003, the Company and the Union had agreed on most benefit and language issues, but were still apart on other issues, including wages.

7.      By March 2003, the Company had proposed a final written wage proposal with a 2% increase in each year of a 3-year contract, along with wage caps for certain positions. Sandoval purported to respond on behalf of the Union with a written wage proposal that offered a 3% increase in the first year, a 2% increase in the second year, and a 1% increase in the third year, with no wage caps.  Both proposals averaged about $.19 to $.20 a year, but the Union's proposal was more front-loaded.

8.      Although the parties appeared to have been very close to an agreement at that point, the Union acknowledged at a subsequent meeting that Sandoval was unauthorized to offer the proposal he had offered on behalf of the Union.  The Union then offered proposals seeking much larger increases than the proposal offered by Sandoval sought, such as one proposal asking for a one-year contract with a $.60 raise.  The Union also proposed that if the Company wanted the contract to be less than three years in length, then the Union wanted to re-examine some of the existing language previously tentatively agreed upon.

9.      With no further meetings scheduled and the parties at impasse, John Lilovich, the Company Vice President, suggested to Sandoval that they meet informally to see if they could make progress.  Lilovich and Sandoval agreed to meet at the picnic tables in front of the Company's facility on September 23, 2003.

10.      Unlike previous meetings, neither side's attorney was present nor was Lilovich accompanied by anyone else from Company management (at least at the beginning of the meeting).  Sandoval brought another Union official, Charles Bridgemon, and some employees with him, including Rumaldo Acevedo, the Chief Union Steward.

11.      At the meeting, Lilovich stated that he had been authorized to drop the salary caps that the Company previously had insisted upon.  There also was a discussion in which the Union asked if it could frame the discussion on wage increases in terms of dollar amounts rather than percentages.  Lilovich left to go into the facility to confer with his brother Joe Lilovich, the Company's Wholesale Manager, and with Tony Alilovich, who were working in the office, and returned with their consent.  During the course of the meeting the Union gave several wage proposals, and each time Lilovich would go into the facility to confer with Joe and Tony before

coming out with the Company's reaction. By this process, the parties eventually reached the stage where a final proposal was made.

Disputed Facts

The parties are in dispute as to practically everything else that took place at the September 23 meeting. This is more than a case of a simple misunderstandings between bargaining parties. These are two completely different versions of events. At the outset, the Company and the Union disagree as to which side made the final proposal and what that final proposal was. The Union maintains that the final proposal was the Company's and that it was for a 2-year agreement with a $.50 wage increase in the first year, a $.10 wage increase in the second year, and a bonus of $100 in each year starting with December 2003. The Company maintains that the final proposal was the Union's, and that the proposal was for a 3-year agreement with a $.50 wage increase in the first year, a $.10 wage increase in the second year, no increase in the third year, and a bonus of $100 in December 2003.

The parties also disagree about what transpired after the final proposal was presented. The Union maintains that after Lilovich verbally presented the proposal, it caucused and then told Lilovich it agreed to this proposal, at which time Lilovich declared that the Union had a contract and shook hands with the members of the Union negotiating team. The Company maintains that Lilovich never said the Union had a contract and did not shake hands with the members.

The Union further maintains that Sandoval wrote out what he believed to be the agreement on wages (Co. Ex. 10), which characterized the proposal as being the Company's and the Union agreeing to it, and that Sandoval presented it to Lilovich for his signature next to the

Union representatives' signatures. The Union acknowledges that Lilovich refused to sign the document, but maintains that the reason he gave was because he preferred a formal, typewritten document which he assured them he would sign. Lilovich, on the other hand, maintains that the document Sandoval wanted him to sign was not Company Exhibit 10, and that the document he saw made no reference to the proposal being his or the Union agreeing to the Company's proposal, but rather simply contained the Union's proposal with a line for his signature. He testified that he told the Union he would not sign because he did not have the authority to agree to the proposal, but that Sandoval should fax him a typewritten proposal and the shareholders of the Company would consider it and respond to it.

The parties do agree, however, to the authenticity of another document containing the $.50 /$.10 proposal, which Sandoval wrote on a sheet of paper with the Union's logo on it and which he gave to Lilovich at the meeting (Co. Ex. 9). But they disagree as to the circumstances under which it was created. Lilovich testified that Sandoval wrote this out and tendered it to him as the Union's last proposal, after which Lilovich brought it in with him to show Tony and Joe, explaining that it was the Union's proposal. Lilovich testified that he, Joe and Tony decided that John should go back outside and terminate the meeting and ask Sandoval to write it up as a formal proposal and fax it to the Company for its consideration by the shareholders. The Union, on the other hand, claims that this document was written up by Sandoval at the end of the meeting after the Union already had agreed to Lilovich's proposal, and that Sandoval did so at Lilovich's request so that Lilovich would have something by which to remember the agreement.

The parties are also in stark disagreement about how the meeting ended. All the Company witnesses testified that toward the end of the meeting Tony and Joe came out to join the meeting and that another management representative, Richard Havlin, arrived as well. At

that time, Sandoval insisted that the Company then and there sign a paper for an agreement or else he would not negotiate further and the employees would go on strike. All of the Company witnesses testified that John, Joe and Tony told Sandoval they would not sign any paper until the proposal was reviewed by all of the shareholders of the Company. They testified that Sandoval became agitated, and kept insisting that he wanted a contract that day, and that the meeting ended in rancor with both parties walking away and no one shaking hands. The Union witnesses claimed that the meeting ended with Lilovich assuring them that they had a contract. They claimed that Tony, Joe and Havlin were standing no closer than 20 feet away at the door of the plant and never joined the meeting, that Sandoval did not insist on a contract, and that the meeting did not turn rancorous.

Were I to resolve all the disputes described above in favor of the Union, the critical question would be whether these actions constitute an agreement. In the field of labor relations, when the parties have agreed to the substantive terms and conditions of a contract, even though it may not be reduced to writing, they can nevertheless be held to its terms. *H. J. Heinz Co. v. NLRB*, 311 U.S. 514, 524-26 (1941); *NLRB v. Haberman Constr. Co.*, 641 F.2d 351 (5th Cir. 1981). Technical rules of contract law do not control whether an agreement has been reached. *Ivaldi v. NLRB*, 48 F.3d 444, 448 (9th Cir. 1995). "Rather, a more crucial inquiry is whether the two sides have reached an 'agreement,' even though that 'agreement' might fall short of the technical requirements of an accepted contract." *NLRB v. Donkin's Inn, Inc.*, 532 F.2d 138, 141 (9th Cir. 1976). Whether the parties have reached such an agreement is a entirely factual question. *Ivaldi*, 48 F.3d at 448.

Were I to accept the Union's version of events, the combination of the prior collective bargaining agreement (Co. Ex. 1), the "Agreed To Contract Changes" document (Co. Ex. 4),

Sandoval's handwritten notes (Co. Ex. 9), and oral testimony that the parties agreed to continue the health insurance offered by the Company establish that the parties reached agreement on all material terms on September 23. Even if, as the Company argues, there were some unresolved issues, and thus no complete contract, minor discrepancies that may exist do not relieve a party of the obligation to execute an agreed upon contract. *Bennett Packaging Co.*, 285 N.L.R.B. 602 (1987); *Parkview Furniture Mfg. Co.*, 284 N.L.R.B. 947 (1987); *see, e.g., Timber Prods. Co.*, 277 N.L.R.B. 769 (1985). Also, the fact that the terms agreed upon are in separate documents is of no significance. *See Mt. Airy Found.*, 230 N.L.R.B. 668, 677 (1977) (finding that parties reached agreement based on three documents incorporating all of the final proposals of one party). Therefore, an agreement was reached if one accepts the Union's version as true.

I do not accept the version of events offered by Sandoval, Acevedo, and Bridgemon because I find it less credible than the version offered by Alilovich, Havlin, Joe, and John. Accordingly, I find that the Union's version does not accurately reflect what happened on September 23. There are at least two possibilities for this inaccuracy. One is that the Union witnesses are deliberately misrepresenting what occurred. Such a scenario is not entirely inconceivable. They certainly have strong incentives to misrepresent. Although Sandoval denied that he was under any pressure to get a contract concluded at the September 23 meeting, it is inconceivable that he could not have been. The employees had gone for close to three years without a contract and were undoubtedly very restive about getting one. They had already voted to authorize a strike in August 2003,[4] and the Union, by its own admission, had to retreat from a

---

[4] The strong desire of the employees to strike gives the Union further incentive to misrepresent what occurred on September 23, namely an incentive to protect the striking employees from the possible adverse consequences of a strike. In the case of an ordinary economic strike, an employer can hire replacement employees and not recall strikers at the end of

14

wage proposal it had made earlier in negotiations because the employees would not accept it. Union officials working directly with employees, such as Sandoval and Acevedo, certainly observed this restiveness among the employees and understandably felt some pressure to achieve a new contract, or at least to show some sign of their leadership in pursuing one. This pressure was probably intensified for Sandoval because he had replaced a business agent that had previously successfully negotiated a contract. One would expect that people in Sandoval and Acevedo's position would at least have the incentive, if not the willingness, to misrepresent reaching an agreement on September 23 after coming so very close.

The respective testimonies of Sandoval and Acevedo further support an intentional misrepresentation theory as the reason for the inconsistent versions. Although Acevedo insisted he was not a disgruntled employee, he admitted that he had filed an unsuccessful charge against the Company with the NLRB complaining about mistreatment by the Company, including an assertion that Havlin had chased him to the restroom.[5] Acevedo was obviously a biased witness. As for Sandoval, he was a defensive, hostile and evasive witness. He persistently refused to answer questions on cross examination, would not admit to even the most obvious facts if he

---

the strike until openings developed. By concocting an unfair labor practice charge, the Union could provide protection by claiming that the strike was an unfair labor practice strike, *i.e.* not to protest the failure to reach an agreement, but to protest the Company's so-called illegal "refusal to bargain" by reneging on an agreement already reached. The Union could thereby demand at the conclusion of the strike that the Company immediately discharge all the replacements and reinstate all the strikers, which is precisely what the Union did.

[5] Even if Acevedo was credible, there are other problems with his testimony. He claimed that he understood everything that was said at the September 23 meeting, but in his affidavit to the NLRB he only said that he "thought" he understood most of what was said at the meeting. In addition, he had to testify through a translator at the hearing and admitted that he could not read English. It is questionable, therefore, how much of what he said occurred at the meeting was what he understood based upon what Oscar was translating to the employees, as opposed to what he himself understood.

perceived (rightly or wrongly) that it was harmful to his position, and was generally argumentative. In addition, Sandoval was highly combative in his testimony. It is credible that, exactly as the Company witnesses described it, Sandoval indeed became upset at the September 23 meeting when the Company representatives told him that they had gone as far as they were going to go and were not going to go any further that day. It is also credible that Sandoval then demanded that he wanted a contract that day and that he had 100% support from the employees for a strike. In the end, regarding both Sandoval and Acevedo, one could conclude that they deliberately misrepresented what occurred on September 23 and that their respective versions of the events should not be credited where they contradicted that of the Company's witnesses.

One incident particularly raises doubts about Sandoval's credibility. A newspaper article appeared in *Hoy*, a Spanish language periodical, shortly after the strike began (Co. Ex. 17). In that article, a reporter, Jaime Reyes, quoted Sandoval as stating that the $.50 and $.10 proposal was the Union's proposal, and that management "apparently" accepted the proposal. Reyes was subpoenaed to testify at the hearing and verified the accuracy of the article. Sandoval insisted that Reyes misquoted him on this point as well as throughout the article, but it is striking that the reporter would have misquoted him as giving a version that was consistent with the Company's version when Reyes himself was not able to contact the Company for its version of events. It is highly unlikely that Reyes not only would have misquoted Sandoval, but would have misquoted him in a way that was consistent with the Company's version when the reporter never talked to the Company. Reyes also quoted Sandoval as saying that he submitted the Company's counter-proposal of October 7, 2003 to the Union members and that they turned it down. Reyes's testimony is significant in an even more fundamental sense. Not only was he a credible witness, but he was the *only* witness at the hearing who had no apparent motive to fabricate his

16

testimony.[6]  Therefore, where his testimony contradicted that of Sandoval, it discredits Sandoval. I find Sandoval's testimony unbelievable that the reporter misquoted him.[7]  While the subject of this discredited testimony by Sandoval could be said to be over a collateral issue, one could conclude that if Sandoval was untruthful in that regard, then he was also being untruthful in other areas where his testimony was uncorroborated or disputed.

Aside from that of Sandoval and Acevedo, the testimonies of other Union officials reflect a strong desire to placate restive employees.  For example, in a letter from Union Secretary Treasurer Chris Andersen to John Lilovich on December 1, 2003, Andersen denied that the Union was "refus[ing] to meet and bargain a new contract," and stated that "at no time has Local 1 refused or rejected the idea of meeting to bargain a fair contract" (Co. Ex. 15).  At the hearing, Andersen attempted to offer an explanation that he did not mean to state that there was not a successor contract already in effect, but was really just writing the letter for the consumption of the rank-and-file.  This testimony confirms strong pressure on Union officials to negotiate a new contract and demonstrate strong leadership in this effort.  This pressure could certainly have motivated other Union officials to testify as they did.

This theory of intentional misrepresentation on behalf of the Union is contradicted only by the fact that, with the exception of Sandoval and Acevedo, there was little in the respective demeanor of the other Union witnesses that suggests intentional misrepresentation.  But bearing

---

[6]  I attach no significance to the Union's argument that the reporter's testimony is somehow suspect because he appeared in court represented by counsel from the Tribune Company.  Counsel was most likely concerned about an issue entirely unrelated to the facts of this case, namely protecting the paper's possession of the reporter's notes.

[7]  It is further disturbing that Sandoval telephoned the reporter shortly before the hearing to ask him to retract his story.

in mind the evidence I heard, the only other credible version of what happened here was touched upon by the Union's lawyer in his hypothesis as to why Sandoval might have denied making statements in the *Hoy* article that were attributed to him:

> If we assume that the reporter from *Hoy* did not misinterpret what Mr. Sandoval told him and wrote down verbatim exactly what Mr. Sandoval told him, then it has to be that Mr. Sandoval actually believed that he said something differently than what was posted in that paper. He can come up [on] the stand and say, I said something, I said this but I didn't mean this because he actually believes that he didn't say that.

In other words, Sandoval believes the truth of that to which he testified, regarding both the *Hoy* incident and the events surrounding the September 23 meeting. However, he believes in the truth of that to which he testified not because those events happened as he says they did, but because he *wants* – if not *needs* – to believe that they happened as he described. With the possible exception of Acevedo, the same may be said about all the Union witnesses. Given the strong pressure they were under, their prolonged attempt to reach a new agreement, and the fact that the employees were ready to strike, the Union officials were desperate for and pre-determined to get an agreement on September 23 and came to believe that they actually got it even though the facts tell otherwise. Morally, it is better if they believed what they were saying but it does not alter the fact that what they said is not true.[8]

---

[8] At the very least, the Union was unpersuasive in explaining inconsistencies between their positions now and those expressed earlier in various documents. As just one example, there is an ironic parallelism between the attempts of two separate Union witnesses, John Andersen and Rumaldo Acevedo, to explain inconsistencies in their respective versions of events. In responding to the inconsistency between his testimony that the parties had come to an agreement on a new contract and his December 1, 2003 letter to John Lilovich denying that the Union was "refus[ing] to meet and bargain a new contract" and stating that "at no time has Local 1 refused or rejected the idea of meeting to bargain a fair contract" (Co. Ex. 15), Andersen attempted to offer an explanation that he did not "mean to state" that there was not a successor contract already in effect, but was really just writing the letter for the consumption of the rank-and-file. Similarly, when confronted with the inconsistency between his testimony that Tony and Joe were "no more than 20 feet" away from the meeting tables on September 23 and his statement in an

I considered that the Company witnesses also had an incentive to shade their testimony and thus may have been the ones telling the inaccurate version of what happened. Perhaps the Company manipulated the entire negotiating process. Historically, it is a union shop, but it had been a while since the old CBA lapsed. The Company had an obligation to negotiate in good faith, but it may have adopted a strategy of delaying and/or negotiating to a standstill. It might have engaged in regressive bargaining to make the Union look ineffectual in the eyes of the employees and so help "bust" the Union or break any strike called. One way to execute this policy would be deliberately misleading the Union into believing there was an agreement on September 23 by declaring that there was a contract and shaking hands with the members of the Union negotiating team.

I reject this theory as not the fact. First, nothing supports an inference that the Company was deliberately engaging in regressive bargaining in an effort to make the Union look ineffectual in the eyes of the employees and to "bust" the Union. The Company had what appears to have been a 20-year history of peaceful union relations, and it is improbable that the same people in management would suddenly have become anti-union in the 20th year. In addition, the Company officials seem to have been very diligent in meeting repeatedly with Union officials, and it was John Lilovich who set up the meeting on September 23.[9] With respect

_____

earlier affidavit to the NLRB stating that "[a]t the time we were telling John that we agreed to the offer, Tony and Joe were there with us," Acevedo tried to explain that what he "meant to say" when describing that Tony and Joe were "there with us" was merely that they were at by the door of the plant.

[9] To the extent that the Union suggests that nefariousness may be inferred from the Company's alleged departure from "how companies work" in negotiating the contract (presumably, its departure from the standard labor negotiations practice of establishing a labor relations committee composed of experienced negotiators, negotiating a contract, and putting it into effect without ratification by shareholders), I reject this argument. Despite John Lilovich's

to this particular negotiation, an agreement was almost reached by March 2003, but the Union backed down from this proposal. These actions are inconsistent with some subversive strategy of delaying and/or negotiating to a standstill absent a finding of Machiavellian sublety which I find lacking in the Company owners. In the end, the Company witnesses were straightforward witnesses who were relatively unshakeable on cross examination. I find the Company's version of events and intentions is credible.

Accordingly, I adopt the additional findings of fact:

12.     The final proposal made on September 23 was the Union's. The proposal was for an increase of $.50 an hour in the first year, $.10 an hour in the second year, no increase in the third year, and a bonus of $100 in December 2003. Sandoval wrote out this proposal on a sheet of paper with the Union's logo on it and tendered it to Lilovich as the Union's last proposal (Co. Ex. 9). John brought this proposal in with him to show Tony and Joe, explaining that it was the Union's proposal. Joe, John and Tony decided that John should go back outside and terminate the meeting and ask Sandoval to write it up as a formal proposal and fax it to the Company for its consideration by the shareholders. [10]

---

limited experience in negotiating contracts, this is a relatively young and small family company that is not well-versed in labor negotiations. Its departure from standard practices is not evidence of bad faith. Furthermore, the Union was well aware of this departure, particularly the Company's insistence on running proposals by all shareholders rather than giving its chief negotiator, Lilovich, unfettered authority to negotiate a contract.

[10]  I base this determination on the fact that the document whose authenticity that both parties stipulated to – the handwritten document containing the proposal (Co. Ex. 9) – was written on Union stationery under the Union's logo by Sandoval. Had the proposal been tendered by the Company, it is unlikely that it would have been drafted up by Sandoval on the Union's stationery. Rather, it is more likely that it would have been written by Lilovich, or at least that Sandoval would have explicitly written down that it was the Company's proposal. The Company's version as to how this document came into existence is more plausible. I find that the Union simply wrote its own proposal down to present to Lilovich so he could take it inside

13.      When Lilovich returned to the meeting, Sandoval presented to him some form to sign as evidence to an agreement.  This document made no reference to the proposal being his or the Union agreeing to the Company's proposal, but rather simply contained the Union's proposal with a line for Lilovich's signature.  Lilovich refused to sign the document because he did not have the authority to agree to the proposal, but told Sandoval to fax him a typewritten proposal that the shareholders would consider it and to which they would respond.  Lilovich never said that the Union had a contract and did not shake hands with the members of the negotiating team.[11]

---

the plant with him to show Tony and Joe in order to formulate a response, as John Lilovich testified.  Joe and Tony each testified that John showed them the paper and said it was the Union's proposal.  They decided that John should go back out and conclude the meeting and ask for a more formal document so they could assess the proposal with the other owners for a response.  By contrast, the Union witnesses' version is bizarre.  Sandoval claimed that he wrote up the document after the parties already had reached agreement and that John asked for it so he had something to remind him of what had been agreed.  But why would John need Sandoval to write down John's own proposal?  If it was his own proposal, he would not have needed to have anyone else write it down for him to remember it.  He also could have taken the document that is Company Exhibit 10 into the office and photocopied it rather than ask Sandoval to write out another version.  Sandoval himself admitted that John had never before asked him to do any such thing in their previous negotiation sessions, and Bridgemon conceded that it was unusual for a party in contract negotiations to ask the other party to write down its own proposal.  I therefore credit the Company's version that the $.50/$.10 proposal was the Union's and not the Company's.

[11]  If Lilovich in fact had agreed and said they had a contract, why would he not sign?  Even if he wanted a formal document, one would think he still would have signed anyway or at least have initialed the contract.  Similarly, it is odd that the Union wrote down "refused to sign," which connotes rejection, if all Lilovich said was that he merely wanted a formal document.  If that were the case, the Union would probably have written something along the lines of "agreed, but stated he will sign formal document once presented," or words to that effect.  It is more credible that Lilovich said that he would not sign any document because he first wanted to review the proposal with the other principals of the Company for their response.  This finding is bolstered by the fact that the Union itself, in its original unfair labor practice charge to the NLRB, did not state that Lilovich did not sign because he wanted a formal document, but because he wanted to "review the document with his other principals of the Company" (Co. Ex. 16).

14.     Toward the end of the meeting Tony and Joe came out to join the meeting and another management representative, Richard L. Havlin, arrived as well.  At that time, Sandoval insisted that the Company then and there sign a paper for an agreement or else he would not negotiate further and the employees would go on strike.  John, Joe and Tony told Sandoval they would not sign any paper until the proposal was reviewed by all of the shareholders of the Company.  Sandoval became agitated, and kept insisting that he wanted a contract that day, and that the meeting ended in rancor with both parties walking away and no one shaking hands.[12]

15.     On September 29, 2003, the Union sent John Lilovich a document entitled "Tentative Agreement," which was signed by Sandoval and Bridgemon.  The Company did not countersign the document but instead faxed back a counter-proposal on October 7, 2003, which offered a 3-year agreement with increases of $.25 in the first year, $.25 in the second year, and $.10 in the third year and no bonus.

16.     On December 1, 2003, Union Secretary Treasurer Chris Andersen sent a letter to John Lilovich denying that the Union was "refus[ing] to meet and bargain a new contract,"and stated that "at no time has Local 1 refused or rejected the idea of meeting to bargain a fair contract." (Co. Ex. 15).

---

[12] The Union's version would mean that the Company witnesses were fabricating their entire testimony about the end of the meeting, a proposition I do not believe.  Indeed, the Union witnesses' testimony about Joe, Tony and Havlin was undermined by Acevedo's earlier affidavit to the NLRB, in which he stated that "[a]t the time we were telling John that we agreed to the offer, Tony and Joe were there with us."  Although Acevedo tried to claim that what he meant by saying Tony and Joe "were there with us" was only that Tony and Joe were by the door to the plant, that just does not gibe.  Also, Bridgemon's confirmation that Tony, Joe and Havlin were not there was undermined by his seeming lack of familiarity with the identities of the principals of the Company, as he repeatedly identified John as Tony, and admitted he was not sure who Joe was.  Furthermore, given Sandoval's demeanor on the witness stand, one can more easily envision him acting exactly as the Company witnesses described.

17.     Based on the facts above, there was no meeting of the minds on September 23, 2003, and, therefore, no agreement was entered into between the Company and the Union either then or at any other time during negotiations.

## CONCLUSIONS OF LAW

1.     I have jurisdiction over this case under § 301(a) of the LMRA.

2.     There was no contract entered into between the parties on September 23, 2003 or at any other time during negotiations for a new contract, and the Company therefore could not have violated any such "contract."

3.     This decision is binding on the Union. The Union will not take any action that is contrary to the findings and conclusions of law stated herein.[13]

---

[13] Although this issue is not presently before me, and although the following statements are merely dicta having no force of law, there was discussion throughout these proceedings as to whether my findings here would result in issue preclusion against the NLRB with respect to the same issue. At least two appeals courts addressing the issue have concluded that § 301 findings result in issue preclusion against the NLRB in later proceedings on the same issue. *See NLRB v. Donna-Lee Sportswear*, 836 F.2d 31, 35-37 (1st Cir. 1987) (holding that district court's prior determination, that no binding labor agreement between the parties had been formed, resulted in issue preclusion against the NLRB decision at a later date that a contract had been formed); *NLRB v. Heyman*, 541 F.2d 796, 797 (9th Cir. 1976) (finding that in unfair labor practice case before the NLRB, the Board was required to give effect to previous district court judgment rendered in suit by employer under LMRA in which CBA was rescinded). As noted in *Heyman*, "[t]o fail to give any effect to the district court's judgment would here render [the district court's jurisdiction] nugatory and defeat intentions of Congress that alternative forums be available and that contract violations be left to the usual processes of the law." *Id.* (quotations omitted). Indeed, the NLRB has even acknowledged itself that while it need not afford collateral estoppel to other court proceedings in certain circumstances, it should be more inclined – if not obligated – to do so when the existence of a contract is the central issue in a particular dispute. *See Field Bridge Assocs.*, 306 N.L.R.B. 322, 323 n. 2 (1992). Finally, given the NLRB's intervention in this proceeding as a party in interest, there is even more reason to believe that any issues resolved here will collaterally estop the NLRB. *See Donna-Lee Sportswear*, 836 F.2d at 34 (noting that one of the NLRB's arguments for why it should not be bound by a district court's determination that no contract existed between the parties was that it was not a party to the action before the district court). In light of this case law, were the issue properly before me I would conclude that my findings and conclusions here preclude the NLRB from making any inconsistent findings

4.      Judgment is hereby entered in favor of Plaintiff T & J and against Defendant

Local 1.


ENTER:

*James B. Zagel*
_____
James B. Zagel
United States District Judge

DATE: March 16, 2005

---

regarding the existence of a contract because the existence of the contract is the essence of the dispute here.